UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------

STEVEN MATTA,

                                        Plaintiff

            -against-

CAROLYN W. COLVIN, Acting
Commissioner, Social Security Administration,

                                        Defendant.
----------------------------------------------------------X

No objections to this Report and Recommendation ("R&R")
have been filed.  I therefore review it for clear error.  I find no
error, clear or otherwise, and accordingly adopt the R&R as the
decision of the Court.  The case is hereby remanded to SSA for
further proceedings consistent with the R&R.

SO ORDERED.

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

2/8/16

**REPORT AND
RECOMMENDATION**

13 Civ. 5290 (CS)(JCM)

To the Honorable Cathy Seibel, United States District Judge:

Plaintiff Steven Matta ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§§ 405(g) and 1383(c)(3), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for Supplemental Security Income ("SSI"),

Title XVI benefits and Disability Insurance (collectively, "disability benefits"), finding him not

disabled.  Presently before this Court are: (1) the Commissioner's motion for judgment on the

pleadings to affirm the Commissioner's decision pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure ("Rule 12(c)") (Docket No. 18); and (2) Plaintiff's cross-motion for judgment on

the pleadings to reverse the Commissioner's decision, directing the Commissioner to pay

appropriate retroactive and future disability benefits to Plaintiff or, in the alternative, vacate such

decision and remand for further consideration by the Commissioner, pursuant to Rule 12(c)

(Docket No. 20).  For the reasons below, I respectfully recommend that the Commissioner's

motion be denied, that Plaintiff's cross-motion be granted in part and denied in part, and the case

be remanded for further proceedings.

## I. BACKGROUND

Plaintiff was born on June 10, 1966. (R.[1] 97).  On December 15, 2010, Plaintiff applied

for disability benefits, alleging that he had become disabled as of January 14, 2010. (R. 97).  On

the field office disability report, Plaintiff alleged that the following physical and mental

conditions limited his ability to work: memory loss, severe headaches, diabetes, low back pain,

and a learning disability. (R. 140).  The Social Security Administration ("SSA") denied

Plaintiff's application on May 31, 2011. (R. 51).  Plaintiff appealed the denial, and on January

20, 2012, Plaintiff testified before Administrative Law Judge ("ALJ") Robert C. Dorf. (R. 24-

48).  On March 14, 2012, ALJ Dorf affirmed the denial of benefits, concluding that Plaintiff was

not disabled. (R. 11-23).  The Appeals Council subsequently denied Plaintiff's request for review

on May 31, 2012. (R. 1-6).  Thereafter, Plaintiff appealed the SSA's decision by filing the

present action on July 26, 2013, (Docket No. 2), contending that the ALJ's decision was not

supported by substantial evidence in the record and was based on errors of law.

### A. Plaintiff's Medical Treatment History

The administrative record contains medical records from the alleged date of onset of

Plaintiff's disability to the time of the ALJ's determination.  On November 4, 2010, Plaintiff saw

Dr. Allison Chatalbash, an internist at Mount Sinai Hospital, for a follow up appointment after

his screening for Diabetes Mellitus ("diabetes"), which reflected elevated blood sugar. (R. 359-

60).  Plaintiff reported that he had been aware he had "a problem with his sugars" but that he had

never taken any medication for the condition. (R. 360).  Plaintiff noted that "the pills ma[de] him

nervous" because of his illiteracy and that he did not "understand the pill bottles." (R. 360).  He

stated his willingness to begin taking medication for the condition. (R. 360).  Plaintiff also

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed in this action on December 6, 2013. (Docket No. 11).

reported symptoms of polyuria (excessive urination) and polydipsia (excessive thirst). (R. 360).
Dr. Chatalbash spent more than half of the thirty-minute visit counseling Plaintiff on the care
moving forward for diabetes, including instructing Plaintiff to seek assistance from a pharmacist
in placing the prescribed metformin in a daily pill box. (R. 361). Dr. Chatalbash noted that if the
patient was comfortable with the metformin at a follow-up appointment in three weeks, she
would add an ACE-Inhibitor, but that she did not want to "overwhelm" Plaintiff at this
appointment. (R. 361).

Plaintiff returned to Mount Sinai Hospital on January 5, 2011 and saw internist Dr. Mark
R. Kahn. (R. 328-32). Plaintiff reported that he had been taking the prescribed metformin on a
daily basis and that he had recently sought treatment for a penile chlamydia rash, a likely result
from diabetes-caused frequent urination. (R. 329). Records from that emergency room visit
appear in the record as well. (R. 198-201). Plaintiff continued to suffer from frequent urination,
as often as every ten minutes, as well as low back pain. (R. 329). Dr. Kahn noted that Plaintiff's
diabetes continued to be uncontrolled, and increased his metformin from 500 milligrams to 1000
milligrams, recognizing that a once-daily medication regime was "simpler" for Plaintiff, given
his illiteracy. (R. 330). Dr. Kahn also prescribed medication for Plaintiff's hypertension, and
stated that Plaintiff should come back for a follow-up in two weeks when he would increase the
metformin to a twice-daily regime if Plaintiff was willing. (R. 330). In an addendum to the
report, Dr. Ania Wajnberg noted that Plaintiff was illiterate and "resistant to all changes in
med[ical] regimen and taking [oral] medications as cannot read bottles." (R. 330). Dr. Wajnberg
recommended "better education and teaching" to monitor Plaintiff's progress and compliance,
along with a follow-up appointment in two weeks to further increase his medication and monitor
adherence. (R. 330).

On January 19, 2011, Plaintiff returned to Mount Sinai Hospital and saw internist Dr. Joseph Hinchey. (R. 347-50). Plaintiff complained of chest tightness and shortness of breath with heart palpitations since increasing his diabetes medication at his last visit. (R. 348). Plaintiff also reported headaches, chills, abdominal discomfort, weight loss, loss of appetite and less frequent urination. (R. 348). Dr. Hinchey concluded that Plaintiff continued to have persistently high blood sugar and added a twice-daily dose of glipizide, noting that Plaintiff would likely require insulin, but "considering MS [(Mental State)] may be difficult to ensure compliance." (R. 349). Dr. Wajnberg again added an addendum to Dr. Hinchey's report, remarking that Plaintiff was a "poor historian due to MR [(Mental Retardation)]," and has "[d]ifficulty managing meds due to illiteracy." (R. 350).

On February 2, 2011, Plaintiff saw Dr. Kahn for a follow up regarding his hypertension, diabetes, and low back pain. (R. 333-35). Plaintiff's shortness of breath and gastrointestinal distress were improved since his last visit, but he continued to urinate frequently and his diabetes was still uncontrolled. (R. 333-34). Dr. Kahn increased Plaintiff's dose of glipizide. (R. 335). Dr. Jonathan Ripp added an addendum noting that Plaintiff's uncontrolled diabetes required "follow-up with brother to ensure that patient is getting medication appropriately." (R. 335).

On March 8, 2011, Plaintiff saw Dr. Neil Parikh for further follow up regarding his diabetes, low back pain, and hypertension, and requesting a letter. (R. 202-04). Plaintiff reported that he did not take medication for his back pain but that he was willing to try Tylenol to alleviate the pain. (R. 202). Dr. Parikh's examination reflected that Plaintiff had a normal gait, and no peripheral edema or swelling, erythema, or tenderness of his extremities. (R. 204). Dr. Parikh's report states that more than half of the thirty-minute visit was spent counseling Plaintiff on the medications that he had been prescribed for the uncontrolled diabetes. (R. 204). Dr.

Parikh provided a letter indicating that with Plaintiff's "chronic low back pain, it is not advisable that he carries heavy items consistently." (R. 236). The next day, Plaintiff returned to Mount Sinai Hospital reporting that he needed a new letter regarding his back condition for work. (R. 205).

Plaintiff returned to see Dr. Kahn on April 8, 2011. (R. 338-40). Plaintiff reported that he was taking metformin and glipizide and had decreased urination frequency. (R. 339). Plaintiff also complained of "slight right foot pain and left index finger pain." (R. 339). Dr. Kahn observed that Plaintiff had no peripheral edema, no ulcers, lesions, or deformities on his feet. (R. 339). He prescribed 400 mg of ibuprofen for pain as needed, and referred Plaintiff to podiatry. (R. 339).

On May 27, 2011, Plaintiff saw podiatrist Dr. Rupal Oza at the Mount Sinai Podiatry Clinic. (R. 311-12). Plaintiff reported that he had been in a car accident in 1997. (R. 311). Plaintiff said he had pain in his ankle present for six years. (R. 311). He stated that he used a cane for support and did not take medication for the pain. (R. 311). Dr. Oza noted that Plaintiff had tenderness to palpation in the lateral aspect of his ankle, no pinpoint tenderness, some pain on ankle range of motion, and equinus.[2] (R. 311). Dr. Oza ordered an X-ray of the ankle, prescribed Voltaren gel, and advised Plaintiff to continue using the cane, stating that he may need physical therapy and/or orthosis for ankle support, depending on the results of the X-ray. (R. 311). The X-ray results, dated May 29, 2011, contain no radiographic evidence of a displaced fracture, osteochondral lesion, dislocation, subluxation, soft tissue air or radiopaque foreign body. The findings included minimal tibiotalar degenerative joint disease with marginal bony productive change at the distal tibial epiphysis and faint vascular calcifications. (R. 262).

---

[2] Equinus is a condition in which the upward bending motion of the ankle joint is limited.

The reviewing physician diagnosed minimal tibiotalar degenerative joint disease and plantar calcaneal spur. (R. 262).

On June 3, 2011, Plaintiff saw podiatrist Dr. Kenneth Kemp at the Mount Sinai Podiatry Clinic for a follow-up evaluation and treatment for his chronic right ankle pain. (R. 324-26). Plaintiff once again reported pain upon ambulation, and that he used a cane for support but did not take any medication for pain management. (R. 325). According to Dr. Kemp's records, Plaintiff stated that he was unaware of his high blood glucose levels. (R. 325). Dr. Kemp observed Plaintiff's continued symptoms of the degenerative joint disease, including tenderness to forced palpation in the lateral aspect of the ankle, no pinpoint tenderness, some pain on ankle range of motion, and equinus. (R. 325). Plaintiff was able to flex his toes on command and against resistance. (R. 325). Dr. Kemp prescribed the use of a brace (pending insurance approval), referred Plaintiff to physical therapy, instructed Plaintiff to continue use of the Voltaren gel and the cane, as needed, and recommended orthopedic shoes and told him to follow up in two months. (R. 325).

On June 17, 2011, Plaintiff saw Dr. Elliot Levine for a follow-up visit regarding his hypertension, low back pain, and diabetes. (R. 314-16). Plaintiff reported that he had stopped taking the diabetes and hypertension medications two months prior to this appointment and was again experiencing polyuria with great frequency. (R. 314). He also informed Dr. Levine that he had been feeling sad and had "a lot of job stress," with these symptoms worsening since he stopped taking his medications. (R. 314). He denied suicidal or homicidal ideation. (R. 314). Dr. Levine advised Plaintiff to restart the medications for diabetes, hypertension, and hyperlipemia and to follow up with the clinic again in four weeks. (R. 316). Dr. Levine wrote a letter on this date stating that Plaintiff was being followed by his office for hypertension, low

back pain, and diabetes mellitus. (R. 233).  In the letter, Dr. Levine relayed that Plaintiff's "diabetes and hypertension limit his ability to perform strenuous physical activity." (R. 233).

Plaintiff saw Dr. Kahn on July 1, 2011 and reported that he had been taking his medication, and had noticed improvement of the polyuria. (R. 342-47).  Dr. Kahn's examination found continued symptoms of diabetes and hypertension, without any other remarkable findings. (R. 342-47).

On August 5, 2011, Plaintiff saw Dr. Steven Ea in the Department of Podiatry at Mount Sinai Hospital for a follow up regarding his right ankle/heel pain. (R. 355-59).  Plaintiff reported that the discomfort started well over fifteen years prior to this visit, and that it was "not so much pain as much as some numbness and swelling" in his right lower extremity. (R. 356).  Dr. Ea's examination revealed that Plaintiff experienced no pain on range of motion or palpation of the ankle or foot, no pain on ankle inversion, no malleolar pain, and no indication of irritated nerves. (R. 357).  He diagnosed Plaintiff with primary localized osteoarthritis in the ankle and foot and degenerative joint disease, and suggested the use of an over-the-counter brace, as Plaintiff's insurance did not cover the prescribed brace from his last visit, as well as a compression stocking to help with the swelling. (R. 357).

On August 26, 2011, Plaintiff saw Dr. James Lee, an internist at Mount Sinai Hospital for a follow up regarding his diabetes, hypertension, and low back pain. (R. 320-24).  Plaintiff reported that he was compliant with his medication, had no complaints, but worried about the diabetes. (R. 320).  He indicated to Dr. Lee that he continued to feel depressed, had not experienced suicidal or homicidal ideation, but would like to take something for the depression. (R. 320).  Noting that Plaintiff's diabetes was still poorly controlled and the oral medication had

been insufficient to combat the diabetes, Dr. Lee started him on insulin, and prescribed celexa for depression. (R. 321). Plaintiff was instructed to follow up in two to three weeks. (R. 321).

On October 12, 2011, Plaintiff returned to Mount Sinai and saw internist Dr. Jeffrey Baumgardner, seeking treatment for depression. (R. 363-68). Plaintiff reported that he was illiterate, unable to read, and needed help. (R. 364). He stated that he was depressed because of his bad neighborhood and that he was "fearful for his life." (R. 364). He said that "a lot of bad things ha[d] happened to him[,] for example he got hit by an ambulance in 1998 and . . . he was beat up by the police and went to jail [in] 1996 even though he was not doing anything bad." (R. 364). He also recounted that there were drug dealers in his building and that he wished "he could attack them with a machete sometimes; however, he does not because he does not have the courage." (R. 364). He said that he had been prescribed celexa for depression at the August appointment and he was not sure whether he was taking it, but believed that he was because his brother had been helping him with his pills. (R. 364). He related that he had a second-grade education at most, and had thought about jumping off a building or driving drunk hoping to kill himself, although Dr. Baumgardner wrote in his report that Plaintiff did not have suicidal ideations. (R. 365). Plaintiff's Patient Health Questionnaire ("PHQ-9") reflected a score of 19.[3] (R. 365).

Dr. Baumgardner wrote in the notes that Plaintiff appeared healthy, alert, and cooperative. (R. 365). He found that Plaintiff had a bizarre affect, his story was rarely consistent, and his thought process was inconsistent. (R. 365). Although Plaintiff was fluent in English, "there seem[ed] to be a problem with [his] internal thought process and his understanding of the world and our conversation." (R. 365). Dr. Baumgardner designated

---

[3] The ALJ noted that a score of 19 on the PHQ-9 indicates "'severe' depression." (R. 15).

Plaintiff's insight/judgment as poor. (R. 365). His assessment was that Plaintiff suffered from "depression likely from multiple sources as well as [a] learning disability and possible personality disorder." (R. 366). He continued:

> It is difficult to fully comprehend what is going on as his story is not consistent and the patient's world view is that everything bad is happening to him even though he 'does nothing.' I do not think that language is the true barrier but rather education as he admits to only a second grade education. [Plaintiff] has multiple social issues at this time which need to be addressed.

(R. 366). Dr. Baumgardner increased Plaintiff's celexa dosage to 40 milligrams, although he thought the benefit would be questionable given Plaintiff's social problems, and suggested that Plaintiff would benefit from counseling. (R. 366). Plaintiff continued to complain of pain in his feet at this appointment and received a referral to podiatry. (R. 366).

**B. Non-Medical Evidence**

In the Disability Report from the Field Office, completed on December 15, 2010, the interviewer's impression of Plaintiff's limitations was that he appeared "very confused" but that no other limitations were apparent. (R. 137). Plaintiff's Functional Report, which his brother John Matta completed on April 27, 2011, indicates that Plaintiff suffered from a learning disability and diabetes. (R. 157-65). The Functional Report states that Plaintiff lived with his brother in an apartment and Plaintiff's brother cared for Plaintiff, reminding him to "keep up with himself" and to take his medications. (R. 158). Plaintiff's brother reported that he shopped for and prepared food for the household, and did all the chores because Plaintiff was unable to do these tasks. (R. 158-61). The Functional Report indicates that Plaintiff could not read or write, experienced low back pains, had difficulty sleeping, was forgetful, had no hobbies, did not reason, was very nervous, did not like anyone around him, had no social activities, could not follow spoken or written instructions, and was argumentative and defensive. (R. 158-64).

According to the report, Plaintiff only left the house once a day to go to his welfare program, using public transportation. (R. 160-62). The report states that Plaintiff used a cane and could only walk for one block before needing to rest for two hours. (R. 164). Plaintiff's brother also reported to SSA that Plaintiff had been in a special education school in Puerto Rico, and provided a contact phone number so that SSA could contact the school for their records. (R. 175). Plaintiff reported that his last job was with Esteem Security as a security guard in 2009. (R. 146). However, Plaintiff's numerous requests for letters documenting his medical conditions for work in 2011 call into question whether Plaintiff was, in fact, also working during that time. (R. 202, 205, 233).

## C. Consulting Physicians

Plaintiff visited two consulting physicians over the course of his disability benefits application. First, internist Dr. Vinod Thukral examined Plaintiff on May 13, 2011. (R. 207-10). Plaintiff reported to Dr. Thukral that in the second grade he was diagnosed with a learning disability/depression and went to a special education school. (R. 207). He told him he was seen by a psychiatrist and had psychotherapy but received no medication. (R. 207). He also reported that he had a history of diabetes, hypertension, and lower back pain, indicating that the pain was 6/10 to 8/10, dull and intermittent, and precipitated by standing and walking. (R. 207). Plaintiff stated that he did not know how to cook but that he could clean, do the laundry and shop, all with the help of his brother. (R. 208). During a physical examination, Dr. Thukral found Plaintiff had no acute distress and no trouble dressing or undressing, or getting on or off the examination table. (R. 208). Plaintiff had a normal gait and stance, could walk on heels and toes without difficulty and used no assistive devices. (R. 208). Musculoskeletal exam results were normal with full range of motion of the ankles and all joints stable and nontender. (R. 209). Dr.

-10-

Fernando diagnosed Plaintiff with hypertension, diabetes, lower backache, and learning disability/depression, all by history. (R. 209).  Dr. Thukral opined that Plaintiff had "no limitations for sitting, standing, pulling, pushing or any other such related activities." (R. 210).

Dr. Michael Alexander, Ph.D. conducted the psychiatric evaluation of Plaintiff on May 13, 2011. (R. 211-14).  At this examination, Plaintiff claimed that he completed elementary school but "never really learned how to read or write."  (R. 211).  Regarding his current functioning, Dr. Alexander noted that Plaintiff took public transportation to the examination by himself, but that he suffered from difficulty falling asleep with some loss of appetite and dysphoric moods. (R. 211).  Plaintiff reported that he had sad moods off and on, whenever he felt that his neighbors were making fun of him for being unable to read, but denied suicidal or homicidal ideation. (R. 211).  Dr. Alexander indicated there was no evidence of panic or manic-related symptoms or any thought disorders. (R. 211).  Dr. Alexander diagnosed a lifelong history of cognitive deficits, manifested by general learning limitations, but concluded that Plaintiff's manner of relating and social skills were adequate. (R. 211-12).  He found that Plaintiff's eye contact was appropriate, his expressive and receptive language were adequate for normal conversation, his thought processes were coherent and goal directed with no evidence of hallucinations, delusions or paranoia, his affect was appropriate, and his attention and concentration was intact. (R. 212).  Plaintiff was able to count and attend to the questions in the exam without difficulty, but could not complete simple calculations due to limited ability with arithmetic. (R. 212-13).  Plaintiff demonstrated intact recent and remote memory skills, but his intellectual functioning was below average and his general fund of information appeared "somewhat limited." (R. 213).  Dr. Alexander noted that plaintiff reported being able to dress, bathe, and groom himself, make simple meals, clean, purchase simple things independently, and

to manage his own money and take public transportation by himself. (R. 213).  He stated that he had no close friends but was close to his brother. (R. 213).

Dr. Alexander concluded that Plaintiff could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, keep a regular schedule, learn new tasks, perform more complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (R. 213).  His diagnosis was mild depressive disorder and he recommended individual counseling for depressed mood. (R. 214).  Dr. Alexander found that Plaintiff's symptoms were consistent with psychiatric problems, as well as substance abuse problems,[4] and did not significantly interfere with Plaintiff's ability to function on a daily basis. (R. 213).

As discussed below, Plaintiff was also referred for a consultative examination with regard to Plaintiff's alleged cognitive disorder following the administrative hearing, however Plaintiff failed to attend the examination on two occasions in February 2012. (R. 369-71).

## D.  Plaintiff's Testimony During January 20, 2012 Hearing Before ALJ Dorf

Plaintiff was represented by counsel at the administrative hearing.  ALJ Dorf began the hearing by asking Plaintiff's counsel if there were any objections or anything for him to be aware of in the record.  Plaintiff's counsel stressed the importance of Plaintiff's academic background and the ALJ interjected to inquire whether Plaintiff was alleging a cognitive disorder:

> ALJ:   Are you alleging a cognitive disorder? Because if you are then I'm going to send the claimant out for an IQ CE.
> ATTY: I would like to do that.
> ALJ:   I will do it.  So the matter will be held in post for an IQ CE.
> ATTY: Absolutely important, yeah.
> ALJ:   So that report will be proffered to you.  You can request if you wish a supplementary hearing and or submit additional evidence.
> ATTY: Wonderful, judge.

---

[4] Dr. Alexander also noted in his report that Plaintiff's alcohol dependence was "in sustained remission." (R. 214).

(R. 33).  Following this discussion with plaintiff's counsel, ALJ Dorf examined Plaintiff through

a Spanish interpreter.  Plaintiff testified that he got dizzy and got headaches when he rode public

transportation, but that he was able to walk up the three flights of stairs to his apartment

everyday, that he used a cane, and that he had pain in his ankle. (R.37-38).  He stated that he was

not able to describe the pain in terms of a number between one and ten, but instead called it a

strong pain. (R. 37-38).  Plaintiff was able to answer basic questions about where he lived and

his work history, testifying that his brother had gotten him a job as a security guard.  ALJ Dorf

questioned Plaintiff on his medical history, asking him why his diabetes was not under control.

Plaintiff reported that it was because of his illiteracy and inability to read the medication bottles.

(R. 42).

     Plaintiff testified that he had never been hospitalized for psychiatric reasons but that he

did suffer from depression. (R. 44).  ALJ Dorf questioned Plaintiff on why he stopped working at

his last job:

> Q:    Were you fired or laid off? What happened?
> A:    Laid off because there was an accident at midnight and that's because of the [INAUDIBLE] fell and then I didn't know that [INAUDIBLE] was over.  Yeah, he was back at the building then the sanitation told me [INAUDIBLE] back in the building laid down on the floor he hurt himself with a garbage can [INAUDIBLE] but I don't see it.  When I went over there he was laying in a little hallway with no lights and then the only thing I had to call 119 – 911.
> Q:    911.
> A:    911.
> Q:    And what happened?
> A:    Then the ambulance come it was – there was a storm. Snow storm.
> Q:    So why didn't you call your supervisor?
> A:    At that time I forgot.  I forgot and then – the first time I [INAUDIBLE] I call 911.
> Q:    Then why were you fired?
> A:    Because I could not communicate with the medic.  Then I called and the ambulance came then Hector write a report.  I called my supervisor, he told me write a report or I write it saying this what happened at the time.
> Q:    And you couldn't write?
> A:    I had to call sanitation.  The guy writes it for me.

ALJ:   All right, I think we need an IQ test and we'll see.  We'll give him what's called the test kind of a TONI which is a test of non-verbal intelligence.  All right, we may have to supplementary hearing.  That's it for today.

(R. 45-46).  Plaintiff's brother attended the hearing as well, but the ALJ declined to hear testimony from him regarding his knowledge of Plaintiff's work history.  (R. 47).  At the conclusion of the hearing, ALJ Dorf reiterated that he would send Plaintiff out for "an examination for IQ, a TONI test." (R. 47).  He instructed Plaintiff to attend the examination. (R. 47).

Plaintiff did not attend the scheduled consultative examinations on February 7, 2012 and February 17, 2012. (R. 369-71).  The administrative record does not contain any indication of the reasons for Plaintiff's failure to appear.  ALJ Dorf never held a supplementary hearing.

## II.  THE ALJ'S DECISION

The ALJ applied the five-step approach in his March 14, 2012 decision. (R. 11-23).  At the first step, the ALJ found that Plaintiff was not engaged in "substantial gainful activity since January 14, 2010, the alleged onset date." (R. 13).  At the second step, the ALJ determined that Plaintiff had the following severe impairments: hypertension, lower back pain, diabetes mellitus, and degenerative joint disease in his right ankle. (R. 14).  Considering the four functional areas for the Paragraph B criteria, the ALJ found that Plaintiff's mild depressive disorder did not cause more than minimal limitation in his ability to perform basic mental work activities and was therefore nonsevere. (R. 14).  At the third step, the ALJ held that Plaintiff did not have a medically determinable impairment or a combination of impairments that were listed in "20 C.F.R. Part 404, Subpart P, Appendix 1." (R. 15).

The ALJ then determined that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. [§§] 404.1567(b) and 416.967(b), with the further

limitation that he was limited to simple, one or two step rote work. (R. 16).  The ALJ found that

Plaintiff could "occasionally lift or carry 20 pounds, lift 10 pounds frequently, is able to sit for at

least 6 hours in an 8-hour workday, and stand/work for at least 6 hours in an 8-hour workday."

(R. 19).  The ALJ held that Plaintiff's medically determinable impairments could reasonably

cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence

and limiting effects of the symptoms were not credible to the extent that they were inconsistent

with the RFC determination. (R. 17).  The ALJ therefore found that Plaintiff's severe

impairments were not of the severity alleged, given that none of the treating physicians had

found Plaintiff to be disabled, the consultative examiner found no limitations, and claimant

appeared to have been working past the date he claimed he stopped working. (R. 19).

In determining Plaintiff's RFC, the ALJ noted his "careful consideration of the entire

record" but did not discuss any cognitive limitations of Plaintiff.  Moreover, the ALJ indicated

that Plaintiff failed to attend both consultative examinations in February 2012, and pointed out

that the regulations make clear that "[i]f you are applying for benefits and do not have a good

reason for failing or refusing to take part in a consultative examination or test which we arrange

for you to get information we need to determine your disability . . . the Agency may find that you

are not disabled. . . ." (R. 18).  Regarding Plaintiff's potential reasons for his failure to appear,

the ALJ stated that "there are some possible mental issues here" but Plaintiff had attended two

other consultative examinations without problem, and had provided no explanation for missing

these two examinations. (R. 18).

At the fourth step, the ALJ determined that Plaintiff could not perform his past relevant

work as a security guard, which was designated as light work with a Specific Vocational

Preparation ("SVP") of 3, as the "exertional and non-exertional requirements of this job" exceeded Plaintiff's RFC. (R. 19).

Finally, the ALJ considered Plaintiff's age, education, work experience, and RFC to determine that Plaintiff could find employment in the national economy based on the Medical-Vocational Guidelines ("the Grid Guidelines"). (R. 19).  The ALJ noted that if Plaintiff had the RFC to perform the full range of light work, considering his age, education, and work experience, a finding of "not disabled" would be directed by the Medical-Vocational Rule 202.18. (R. 20).  Finding that the additional limitations had little or no effect on the occupational base of unskilled light work, the ALJ concluded that a finding of "not disabled" was appropriate. (R. 20).

## III.  DISCUSSION

Plaintiff argues that the ALJ's decision is erroneous as a matter of law and is not supported by substantial evidence.  Specifically, Plaintiff maintains that the ALJ failed to develop the record or conduct a full and fair hearing by not holding a supplementary hearing or obtaining additional reports with regard to Plaintiff's cognitive disorder, that the ALJ failed to consider the combined effect of Plaintiff's conditions, and that the ALJ improperly relied on the Grid Guidelines rather than calling a vocational expert.  Finally, Plaintiff alleges that the ALJ's determination that Plaintiff was not credible was not supported by substantial evidence.

## A.  Legal Standards

A claimant is disabled and entitled to disability insurance benefits if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729

-16-

F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The SSA has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "'and bears the burden of proving his or her case at steps one through four.'" *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (citation omitted).

## B. Standard of Review

When reviewing an appeal from a denial of Social Security benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quotation marks and citations omitted). If the findings of the Commissioner are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

-17-

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The substantial evidence standard "is still a very deferential standard of review—even more so than the 'clearly erroneous' standard.  The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (emphasis in the original) (quotation marks and citations omitted).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149 (citation omitted). Even if there is evidence on the other side, the Court defers "to the Commissioner's resolution of conflicting evidence." *Cage*, 692 F.3d at 122 (citation omitted).  However, the Court cannot merely consider the evidence that supports the ALJ's decision, and must instead "carefully consider[] the whole record, examining evidence from both sides because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quotation marks and citation omitted).

Additionally, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.  Failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quotation marks and citation omitted).

## C.  ALJ's Obligation to Develop the Record

The ALJ has an affirmative obligation to develop the record due to the nonadversarial nature of the administrative proceeding. *Burgess*, 537 F.3d at 128 (citations omitted).  This duty to develop the record remains where the claimant is represented by counsel. *Shaw v. Chater*, 221

-18-

F.3d 126, 131 (2d Cir. 2000).  The ALJ must seek additional evidence or clarification where the documentation "from a claimant's treating physician, psychologist, or other medical source is 'inadequate . . . to determine whether [the claimant] is disabled.'" *Antoniou v. Astrue*, No. 10-CV-1234 (KAM), 2011 WL 4529657, at *13 (E.D.N.Y. Sept. 27, 2011) (alterations in original) (citations omitted).  On the other hand, if "there are no obvious gaps in the administrative record, and the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (quoting *Perez,* 77 F.3d at 47).

If necessary additional information is not readily available from the treating physicians or other medical sources, the ALJ may "ask [the claimant] to have one or more physical or mental examinations or tests" at the SSA's expense. 20 C.F.R. §§ 404.1517, 416.917.  The ALJ is also authorized to seek and consider opinions of experts on "the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairments listed in appendix 1 [of the regulations]." 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii).

The regulations also address the repercussions for failing to appear at a consultative examination.  If a claimant does "not have a good reason for failing or refusing to take part in a consultative examination or test . . . [the SSA] may find that [the claimant is] not disabled." 20 C.F.R. §§ 404.1518, 416.918.  The SSA "will consider [the claimant's] physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if [the claimant] ha[s] a good reason for failing to attend a consultative examination." *Id.*  Examples of good reasons for failing to appear at a consultative examination

include: "(1) Illness on the date of the scheduled examination or test; [and] (2) Not receiving timely notice of the scheduled examination or test, or receiving no notice at all[.]" *Id.*

Where claimants have refused to acknowledge, attend, or cooperate at scheduled consultative examinations or have failed to argue that they had good reasons for not attending such examinations, courts have rejected claims that the ALJ failed to develop the record. *See Cornell v. Astrue*, 764 F. Supp. 2d 381, 392 (N.D.N.Y. 2010); *Stephens v. Astrue*, No. 6:08-CV-0400, 2009 WL 1813258, at *8 (N.D.N.Y. June 25, 2009). However, where the ALJ denies the claimant a meaningful opportunity to offer good reasons for his failure to attend the consultative examination, remand has been found to be appropriate. *Antoniou*, 2011 WL 4529657, at *17-18.

Plaintiff contends that the ALJ erred by failing to satisfy his duty to develop the administrative record when he did not hold a supplementary hearing, or obtain reports on Plaintiff's diabetic condition or cognitive disorders. In reviewing the administrative record, there are gaps regarding Plaintiff's cognitive disorder, which the ALJ had a duty to develop further. Plaintiff's Functional Report, completed by his brother, indicates that Plaintiff had a learning disability, and therefore required his brother's assistance to "keep up with himself" and to take his medications. (R. 158). A number of Plaintiff's treating physicians noted Plaintiff's difficulty with understanding simple instructions regarding his diabetes treatment, indicating that he relied on his brother to ensure that he was taking the correct medication. On January 19, 2011, Dr. Hinchey noted that Plaintiff would likely require insulin because of his persistently uncontrolled diabetes, but "considering MS [(Mental State)] may be difficult to ensure compliance." (R. 349). Dr. Wajnberg also added an addendum to Dr. Hinchey's report, noting that Plaintiff was a "poor historian due to MR [(Mental Retardation)]." (R. 350).

The Functional Report also notes that Plaintiff's brother shopped for and prepared food for the household, and did all the chores, because of Plaintiff's limitations. (R. 158-61). Plaintiff's brother reported that Plaintiff was forgetful, had no hobbies, did not reason, was very nervous, did not like anyone around him, had no social activities, could not follow spoken or written instructions, and was argumentative and defensive. (R. 158-64). The only treating physician to formally assess Plaintiff's cognitive abilities was Dr. Baumgardner, an internist who examined Plaintiff on October 12, 2011. Dr. Baumgardner noted that Plaintiff had a bizarre affect, his story was rarely consistent, and his thought process was inconsistent. (R. 365). His report states that "there seem[ed] to be a problem with [his] internal thought process and his understanding of the world and our conversation." (R. 365). Dr. Baumgardner designated Plaintiff's insight/judgment as poor. (R. 365). His assessment stated that Plaintiff suffered from "depression likely from multiple sources as well as [a] learning disability and possible personality disorder. It is difficult to fully comprehend what is going on as his story is not consistent and the patient's world view is that everything bad is happening to him even though he 'does nothing.'" (R. 366).

Dr. Baumgardner's assessment was consistent with Plaintiff's testimony before the ALJ on January 20, 2012, in which Plaintiff's narrative on why he lost his job was largely incomprehensible.[5] (R. 45-46). At the close of the hearing, the ALJ concluded that he needed additional evidence regarding Plaintiff's alleged cognitive disorder, stating "All right, I think we need an IQ test and we'll see. We'll give him what's called the test kind of a TONI which is a test of non-verbal intelligence. All right, we may have to supplementary [sic] hearing. That's it

---

[5] The ALJ, in his decision, stated that Plaintiff stopped working as a security guard because he was fired, and not because of his impairments. (R. 13). But Plaintiff's narrative regarding the loss of his job seems to indicate that he may have been fired because his cognitive impairments interfered with his ability to perform the job.

for today." (R. 46).   Nevertheless, the ALJ ultimately determined that Plaintiff was not disabled without the proposed IQ and TONI tests, and without obtaining Plaintiff's educational records. After considering the four functional areas set out in the regulations for evaluating mental disorders ("Paragraph B criteria"), the ALJ found that Plaintiff did not "really express any difficulties with his activities of daily living[,]" had a mild limitation in social functioning, had a mild limitation with concentration, persistence or pace, and no episodes of decompensation. (R. 14).

In making these conclusions, the ALJ relied heavily on the findings of the consultative psychologist Dr. Michael Alexander, who examined Plaintiff on May 13, 2011.  Dr. Alexander diagnosed Plaintiff with a lifelong history of cognitive deficits, manifested by general learning limitations, but found that his manner of relating and social skills were adequate. (R. 211-12). He found that Plaintiff's thought processes were coherent and goal directed with no evidence of hallucinations, delusions or paranoia, his affect was appropriate, and his attention and concentration were intact. (R. 212).  Plaintiff also demonstrated intact recent and remote memory skills, but his intellectual functioning was below average and his "general fund of information" appeared "somewhat limited." (R. 213).  Additionally, Dr. Alexander noted that plaintiff reported being able to dress, bathe, and groom himself, make simple meals, clean, purchase simple things independently, manage his own money and take public transportation by himself. (R. 213).  Plaintiff stated that he had no close friends but was close to his brother. (R. 213).  Dr. Alexander concluded that Plaintiff could follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, keep a regular schedule, learn new tasks, perform more complex tasks independently, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (R. 213).  Dr. Alexander concluded

that Plaintiff's symptoms did not significantly interfere with Plaintiff's ability to function on a daily basis. (R. 213).

Although a consulting examiner's conclusion can constitute substantial evidence, *see Mongeur v. Heckler*, 722 F.2d 1033 (2d. Cir 1983), Dr. Alexander's conclusion does not support a finding of substantial evidence when viewed in the context of the entire record. Dr. Alexander's examination was focused on the limitations caused by Plaintiff's depression, not on his cognitive impairments. His conclusion that Plaintiff could follow simple directions and perform tasks independently deviates from the observations of the treating doctors at Mount Sinai Hospital and Plaintiff's testimony at the hearing before the ALJ. Thus, Dr. Alexander's conclusion is weakened by the weight of the other evidence.

Moreover, the record is devoid of any educational documents or cognitive testing, which were needed to evaluate whether Plaintiff's cognitive impairments were severe and would further limit his RFC. This is not a situation where there were only mere unsubstantiated allegations of a mental disability without medical evidence. *Cf. Snyder v. Colvin*, No. 13-CV-6644T, 2015 WL 3407956, at *6 (W.D.N.Y. May 27, 2015) (finding that the ALJ did not abuse his discretion by failing to order intelligence testing or request educational records from the claimant's school to determine whether the claimant's impairments met or medically equaled a listing where the only references to the claimant's alleged learning disability were his own statements that he was in a special education program). Instead, in the instant case, the weight of the evidence points to the fact that Plaintiff appears to have a cognitive impairment that affects him on a daily basis, and the ALJ had a duty to develop the record further on this issue.

Admittedly, the ALJ attempted to develop the record by scheduling additional consultative examinations, but Plaintiff failed to appear. Although the regulations allow for a

claim to be denied based on a claimant's failure to attend a consultative examination, Plaintiff was not afforded an opportunity to explain the reason for his failure to attend these scheduled examinations. The ALJ noted that "[w]hile there are some possible mental issues here, the claimant had no problem attending the other two consultative examinations." (R. 18). However, given the nature of the alleged impairment, Plaintiff's established illiteracy, and Plaintiff's history of compliance with previously scheduled consultative examinations, Plaintiff may have had good reason for his failure to attend these scheduled examinations. The ALJ erred in not providing Plaintiff an opportunity to offer the reason for his failure to attend by scheduling a supplementary hearing. The ALJ further erred by not obtaining the information or testing required to determine whether Plaintiff's cognitive disorder was a severe impairment that met or was medically equal to a listing, or otherwise further limited his RFC.

## D. ALJ's Failure to Develop the Record Was Not Harmless Error

The Commissioner argues that substantial evidence supports the ALJ's finding that Plaintiff's mental impairment was non-severe. However, even if the ALJ erred and the Plaintiff's mental impairment were severe, the Commissioner further alleges this error would have been harmless. The Commissioner maintains that any error in the ALJ's analysis at step two of the sequential evaluation is harmless where the ALJ found other severe impairments and continued beyond step two to consider all of Plaintiff's medically determinable impairments. The Commissioner's reliance on *Stanton v. Astrue*, 370 Fed. App'x 231, 233 n.1 (2d Cir. 2010), for this proposition is misplaced. In *Stanton v. Astrue*, the Second Circuit noted, in dicta:

> Even if we were to reach the merits of [the claimant's] argument, we would not identify error warranting remand because the ALJ did identify severe impairments at step two, so that [the claimant's] claim proceeded through the sequential evaluation process. Further, contrary to [the claimant's] argument, the ALJ's decision makes clear that he considered the "combination of impairments" and the combined effect of "all symptoms" in making his determination.

370 Fed. App'x at 233 n.1.  The same reasoning does not apply where the ALJ's error lies in a failure to develop the record.  It is not enough for the ALJ to merely adhere to the five-step sequential analysis. *Melendez v. Colvin*, No. 1:13-CV-1068, 2015 WL 5512809, at *5 (N.D.N.Y. Sept. 16, 2015).  Instead, "the omission of one or more severe impairments at step two may only be deemed harmless where the ALJ also later considers the effects from the omitted impairment as part of the ultimate RFC determination." *Id.*  Where, as here, the ALJ failed to fully develop the record regarding an allegedly severe impairment, it is impossible for the ALJ to have considered whether that impairment meets a listing, or has an additional effect on the claimant's RFC. *See Texidor v. Astrue*, 3:10-cv-701 (SCH), 2014 WL 4411637, at *3 (D. Conn. Sept. 8, 2014).  A remand is therefore appropriate so that the ALJ can obtain the testing and records needed to determine whether Plaintiff's cognitive disorder is a severe impairment that meets or is medically equal to a listing or otherwise limits Plaintiff's RFC.

**E.  The Use of a Vocational Expert**

Plaintiff avers that the ALJ erred in relying on the Grid Guidelines rather than calling a vocational expert to evaluate whether Plaintiff retained an RFC to perform alternative substantial gainful activity which existed in the national economy.  Generally, the ALJ may resort to the Grid Guidelines to determine whether a claimant's RFC allows him to perform alternative substantial gainful work in the national economy. 20 C.F.R. Pt. 404, Subpt. P, App. 2.  However, if a claimant suffers from both exertional and nonexertional limitations, the Grid Guidelines may not be controlling and instead only provide a framework for consideration of how the individual's work capability is diminished. 20 C.F.R. Pt. 404, Subpt. P, App. 2 200.00(e)(2). Within the Second Circuit, the necessity for a vocational expert is determined on a case-by-case basis. *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).  Courts do not apply the Grid

Guidelines where the nonexertional limitations significantly diminish the claimant's work capacity. *Id.* The Second Circuit has clarified that "significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 605-06.

Here, the ALJ determined that Plaintiff's RFC allowed him to perform light work, but that he was limited to simple, one or two step rote work. As the ALJ failed to sufficiently develop the record regarding Plaintiff's cognitive limitations, the question of how his cognitive, nonexertional impairments affect his ability to perform a range of employment must be considered in light of the evidence developed on remand. If the additional loss of work capacity is significant, the ALJ will be required to call a vocational expert.[6]

### F. Substantial Evidence Supports ALJ's Findings Regarding Plaintiff's Exertional Impairments.

Plaintiff contends that the ALJ improperly concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC conclusion. Plaintiff alleges that the ALJ did not consider the required factors set forth in the regulations regarding evaluating symptoms, and that the ALJ's conclusion is not supported by substantial evidence.

The regulations set forth the factors that the Commissioner will consider in determining the nature and severity of a claimant's impairment(s). These factors include: "(i) [The claimant's] daily activities; (ii) The location, duration, frequency, and intensity of [the

---

[6] Plaintiff also alleges that the ALJ erred in failing to consider the combined effect of all of Plaintiff's medical conditions. I find that the ALJ did consider the combination of impairments, both severe and non-severe, before him. On remand, the ALJ should again consider the combined effect of these impairments in light of the further developed evidence of Plaintiff's cognitive impairment.

claimant's] pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms; (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms; (vi) Any measures [the claimant] use[s] or ha[s] used to relieve [] pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In determining that Plaintiff had a RFC for light work, the ALJ considered the history of treatment notes from Mount Sinai Hospital, including the dosage and side effects of the prescribed medications. (R. 17-18).  He also noted that Plaintiff ambulated with a cane, and that letters from treating physicians reported that his symptoms made it "not advisable . . . [to] consistently carr[y] heavy items" and "limit his ability to perform strenuous physical activity." (R. 18).  Finally, he considered the reports of the consultative examiners, including that of Dr. Thukral, who observed no limitations for sitting, standing, pulling, pushing, or any other such related activities. (R. 18-19).  For the foregoing reasons, I find that the ALJ properly assessed the relevant factors in determining Plaintiff's exertional limitations, and substantial evidence supports the ALJ's findings regarding those limitations.  Accordingly, I recommend that the case be remanded for greater consideration of Plaintiff's cognitive impairments only.

## IV.  CONCLUSION

For the foregoing reasons, I conclude and respectfully recommend that the Commissioner's motion should be denied and Plaintiff's cross-motion for judgment on the

pleadings should be granted in part and denied in part, and the case be remanded for further consideration by the Commissioner of Plaintiff's cognitive impairments.

## V. NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).

Dated:   January 19, 2016
       White Plains, New York

RESPECTFULLY SUBMITTED,

JUDITH C. McCARTHY
United States Magistrate Judge